# No. 24-2449

In the

## United States Court of Appeals for the Second Circuit

DEBORAH MOSS, on behalf of himself and all others similarly situated,

*Petitioner-Appellant,*

v.

FIRST PREMIER BANK, A South Dakota State-Chartered Bank,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Eastern District of New York
Case No. 2:13-cv-5438 (Hon. Brian M. Cogan)

### APPELLANT'S REPLY BRIEF

Jonathan M. Streisfeld
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG
GILBERT**
1 W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Fax: (954) 525-4300
streisfeld@kolawyers.com

Darren T. Kaplan
**KAPLAN GORE LLP**
346 Westbury Ave, Suite 200
Carle Place, NY 11514
Tel: (212) 999-7370
Fax: (646) 390-7410
dkaplan@kaplangore.com

*Counsel for Appellant Deborah Moss*

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................1

FIRST PREMIER OMITS MATERIAL RELEVANT FACTS ................................1

ARGUMENT ........................................................................................6

   I.    LIKE THE DISTRICT COURT, FIRST PREMIER MISSTATES THE "LAWFULNESS" OF TRIBAL LOANS UNDER STATE LAW. .............................................................................................6

   II.   PLAINTIFF MET HER BURDEN OF PRODUCING EVIDENCE OF SPECIFIC FACTS THAT RAISE A GENUINE ISSUE FOR TRIAL AS TO FIRST PREMIER'S KNOWLEDGE OF THE RICO CONSPIRACY. ..............................................................13

   III.   PLAINTIFF MET HER BURDEN OF PRODUCING EVIDENCE OF SPECIFIC FACTS THAT RAISE A GENUINE ISSUE FOR TRIAL AS TO FIRST PREMIER'S AGREEMENT TO JOIN THE RICO CONSPIRACY. ........................................................24

CONCLUSION ...................................................................................28

ii

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................14

*Baisch v. Gallina*,
346 F.3d 366 (2d Cir. 2003)...............................................................27

*Chaney v. Dreyfus Serv. Corp.*,
595 F.3d 219 (5th Cir. 2010)..............................................................20

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
924 F. Supp. 449 (S.D.N.Y. 1996) .....................................................20

*Domanus v. Locke Lord LLP*,
847 F.3d 469 (7th Cir. 2017)..............................................................20

*First Equity Corp. of Florida v. Standard & Poor's Corp.*,
690 F. Supp. 256 (S.D.N.Y. 1988) ...............................................22, 23

*Fisher v. Aetna Life Ins. Co.*,
32 F.4th 124 (2d Cir. 2022)................................................................25

*Gingras v. Think Fin., Inc.*,
922 F.3d 112 (2d Cir. 2019) ................................................................7

*JP Morgan Chase Bank, N.A. v. Nowak*,
No. 23-CV-6834 (JPO), 2024 WL 1329410 (S.D.N.Y. Mar. 28, 2024)24

*Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*,
523 U.S. 751 (1998).......................................................................7, 12

*Lateral Recovery LLC v. Funderz.net, LLC*,
No. 22-CV-2170 (LJL), 2024 WL 4350369 (S.D.N.Y. Sept. 27, 2024)15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..........................................................................10

*McKinney v. City of Middletown*,
49 F.4th 730 (2d Cir. 2022)................................................................15

*New York v. United Parcel Serv., Inc.*,
    942 F.3d 554 (2d Cir. 2019) ................................................................. 24

*Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of
    Oklahoma*,
    498 U.S. 505 (1991) ...................................................................... 8, 12

*Parm v. Nat'l Bank of California, N.A.*,
    No. 4:14-CV-0320-HLM, 2015 WL 11605748 (N.D. Ga. May 20,
    2015), *aff'd*, 835 F.3d 1331 (11th Cir. 2016) ..................................... 26

*S. Katzman Produce Inc. v. Yadid*,
    999 F.3d 867 (2d Cir. 2021) ................................................................. 14

*Salinas v. United States*,
    522 U.S. 52 (1997) ...................................................................... 26, 27

*Sheridan v. Jaffe*,
    No. 94 CIV.9344(AJP)(WK), 1996 WL 345965 (S.D.N.Y. June 24,
    1996) ..................................................................................................... 20

*Solomon v. Am. Web Loan*,
    375 F. Supp. 3d 638 (E.D. Va. 2019) ..................................................... 8

*United States v. Espino*,
    No. 21-1412, 2022 WL 4112679 (2d Cir. Sept. 9, 2022) (Summary
    Order) ................................................................................................... 21

*United States v. Ferguson*,
    676 F.3d 260 (2d Cir. 2011) ................................................................. 19

*United States v. Giovanelli*,
    945 F.2d 479 (2d Cir. 1991) ................................................................. 14

*United States v. Hicks*,
    5 F.4th 270 (2d Cir. 2021) ................................................................... 13

*United States v. Kozeny*,
    667 F.3d 122 (2d Cir. 2011) ................................................................. 21

*United States v. Moseley*,
    980 F.3d 9 (2d Cir. 2020) ...................................................................... 9

iv

*United States v. Neff,*
787 F. App'x 81 (3d Cir. 2019) ....................................................... 8, 13

*United States v. Pepe,*
747 F.2d 632 (11th Cir. 1984) ............................................................ 26

*United States v. Pizzonia,*
577 F.3d 455 (2d Cir. 2009) ......................................................... 24, 25

*United States v. Ruggiero,*
726 F.2d 913 (2d Cir. 1984) ............................................................... 26

*United States v. Scott,*
979 F.3d 986 (2d Cir. 2020) ............................................................... 25

*United States v. Tucker,*
No. 16-CR-91 (PKC), 2017 WL 3610587 (S.D.N.Y. Mar. 1, 2017),
*aff'd sub nom. United States v. Grote,* 961 F.3d 105 (2d Cir. 2020) ..... 6

*United States v. White,*
7 F.4th 90 (2d Cir. 2021) ............................................................. 18, 19

*United States v. Zemlyansky,*
908 F.3d 1 (2d Cir. 2018) .................................................................. 15

*United States v. Zichettello,*
208 F.3d 72 (2d Cir.2000) ................................................................. 18

**State Cases**

*Cash Advance & Preferred Cash Loans v. State,*
242 P.3d 1099 (Colo. 2010) ............................................................... 12

*People v. Miami Nation Enterprises,*
166 Cal. Rptr. 3d 800 (Ct. App. 2014), *review granted, and opinion
superseded*, 324 P.3d 834 (Cal. 2014) .............................................. 12

**Federal Statutes**

18 U.S.C. § 1961(6) ..............................................................*passim*

18 U.S.C. § 1962(c) ..............................................................*passim*

18 U.S.C. § 1962(d) ........................................................................ 15

**Rules**

Federal Rule of  Appellate Procedure 28(b) ................................................. 2

Federal Rule of Appellate Procedure 28(a)(6) ........................................... 2

Federal Rule of Civil Procedure 30(b)(6) ................................................. 23

Federal Rule of Civil Procedure 56.1 ...................................................... 10

## PRELIMINARY STATEMENT

This appeal concerns whether Plaintiff-Appellant Deborah Moss presented sufficient evidence on summary judgment such that a reasonable jury could return a verdict in her favor on the question of whether Defendant-Respondent First Premier Bank knew about and agreed to facilitate the Tucker Lenders'[1] unlawful RICO debt collection scheme. Like the court below, First Premier constructs requirements for proof of a RICO conspiracy that do not appear anywhere in the statutory text and have never been required in this Circuit or by the Supreme Court. Worse, on an issue never raised in the briefing below, First Premier repeats the District Court's error in holding that tribal sovereign immunity rendered loans that were facially usurious under state law "lawful" instead of merely depriving the states of an enforcement mechanism.

In this Reply Brief, Moss addresses the arguments First Premier makes regarding the RICO concepts of "agreement," "collection of unlawful debt," and "knowledge" and explains why Moss has provided more than sufficient evidence on which a reasonable jury could return a verdict in her favor.

## FIRST PREMIER OMITS MATERIAL RELEVANT FACTS

First Premier's "Statement of Facts" spans ten pages (Defendant-Respondent

---

[1] Terms defined in Appellant's Brief are used and have the same meaning herein.

1

Brief (R.B.) pp. 14-24) but omits critical relevant record facts.[2]

First Premier ignores the representations First Premier was making to all participants in the Automated Clearing House (ACH) network regarding every Tucker DBA ACH entry it originated as an Originating Depository Financial Institution (ODFI), including that each entry did not "violate the laws of the United States." (JA 597-600; Appellant Brief (A.B.) 14-15.) ACH entries that were "collection of unlawful debt" on behalf of the Tucker Lenders' RICO Enterprise self-evidently "violate[d] the laws of the United States," including, *inter alia*, 18 U.S.C. § 1962(c).

Although First Premier points the finger at Third-Party Service Provider InterceptEFT ("Intercept") as the party responsible for ensuring the Tucker Lenders were not violating the laws of the United States, the ACH Network rules make clear that "[e]ven if an ODFI utilizes a Third-Party Service Provider in the origination process, the ODFI is responsible for the entries that it originates into the ACH system." (JA 146; A.B. 15.)

First Premier's Statement of Facts ignores that, when Intercept first sought to

---

[2] "The appellant's brief must contain, under appropriate headings…a concise statement of the case setting out the facts relevant to the issues submitted for review…." Fed. R. App. P. 28(a)(6) (made applicable to the Appellee's Brief by Fed. R. App. P. 28(b)). For the record, Moss disputes that First Premier's discussion of cases in other Circuits (R.B. 11, fn. 2) is "relevant procedural history."

2

become an ACH customer, a "primary point of discussion" for First Premier's Treasury Services Risk Committee (TSRC)[3] was that Intercept's "client base" included "payday lenders" for which First Premier "would originate ACH debits for loan payments." (JA 653.) First Premier also ignores that the TSRC was informed that fully 19% of Intercept's ACH debit instructions were returned (JA 660), and that "a majority of the returns received are NSF in nature (in conjunction with their payday lending activity)." (JA 661.) Facts which informed the TSRC both that Intercept's payday lender clients promised to be exceptionally profitable because of the higher fees First Premier charged for ACH returns (JA 221-37), and that Intercept's payday lender clients' borrowers frequently had "non-sufficient funds" (JA 1419) to make their loan payments.

First Premier's Statement of Facts (indeed, its entire brief) ignores that Treasury Services Officer and TSRC member, Katie Kennett ("Kennett"), *specifically approved* the New Client Request Forms ("NCRFs") for the Tucker DBAs *by her signature* on November 3 and 6, 2008. (JA 1283-88; 1293.) Even without First Premier's prior agreement with Intercept, ***this was the "Agreement" whereby First Premier agreed to join the RICO conspiracy***.

Importantly, the Tucker DBA NCRFs Kennett approved included sample loan

---

[3] The TSRC was comprised of some of First Premier's most senior officers, including First Premier's then-President and Board member Dana Dykhouse. (JA 1525, 1501.)

documents which showed in big bold font "Annual Percentage Rate[s]" of not less than 521.429%. (JA 719; 725; 742; 749; 754; 764; 771; 777.) Those interest rates were both usurious and more than twice the enforceable rates in New Jersey and Pennsylvania (JA 253; 255), states in which two of the sample loan documents indicated the borrowers resided. (JA 720; 772.) Had First Premier originated ACH entries in repayment of those two sample loans, those ACH entries would have "violated the laws of the United States," including, *inter alia*, 18 U.S.C. § 1962(c).

First Premier whitewashes its relationship with Moss's specific Tucker Lender, SFS Inc. d/b/a "One Click Cash," protesting that it did not have "a contractual relationship with One Click Cash, and One Click Cash, like the other 'Tucker Lenders,' was not First Premier's customer." (R.B. 19.) However, it is undisputed Kennett specifically approved "SFS Inc. DBA OneClckCash" as a client for First Premier ACH Services in writing on November 3, 2008. (JA 1286.) She signed the "New Client Request" form that, on its face, indicated One Click Cash's "type of business" was "consumer/payday lending" and that the ACH transactions First Premier would be originating as an ODFI on behalf of One Click Cash would be "loan advances and *collections*." *Id*. (emphasis added). It is also undisputed that the documents Kennett reviewed in approving One Click Cash as a First Premier "Client" included a sample promissory note with a "**644.12%.**" "**ANNUAL**

**PERCENTAGE RATE."** (JA-754.)[4] That interest rate was both usurious and more than twice the enforceable rate under New York law. (JA 720.) Had First Premier originated ACH entries in repayment of that sample loan from a New York borrower like Moss, those ACH entries would have "violated the laws of the United States," including, *inter alia*, 18 U.S.C. § 1962(c). This is undisputably clear evidence for a jury's consideration of knowing agreement to facilitate the collection of the Tucker Lenders' unlawful debt—knowing agreement to join the racketeering scheme.

First Premier's Statement of Facts omits that both the TSRC and its Board of Directors knew from documents provided to them by the Bank's own employees that Intercept's clients' "PAYDAY LENDING ACTIVITY" was generating "State inquiries" regarding "usury laws" (JA 1446; 1465) and ignores how the Tucker DBAs quickly became First Premier's highest volume ACH clients, responsible for 25% or more of First Premier's total monthly ACH transactions. (JA 238; 1445.) Despite this knowledge, First Premier continued to originate hundreds of thousands of ACH transactions on behalf of the Tucker DBAs, collecting millions of dollars in unlawful debt payments, in furtherance of the Tucker Lenders' RICO conspiracy.

---

[4] First Premier does not attempt to refute that the District Court made a critical factual error when it erroneously found the pages disclosing the usurious interest rates in big bold boxes *followed* the ACH authorization pages Kennett was hunting for in the NCRF documents (SPA 17), rather than *immediately preceding them*. (A.B. 52.)

**ARGUMENT**

**I.    LIKE THE DISTRICT COURT, FIRST PREMIER MISSTATES THE "LAWFULNESS" OF TRIBAL LOANS UNDER STATE LAW.**

The RICO conspiracy First Premier joined was "to collect unlawful debt," *United States v. Tucker*, No. 16-CR-91 (PKC), 2017 WL 3610587, at *4 (S.D.N.Y. Mar. 1, 2017), *aff'd sub nom. United States v. Grote,* 961 F.3d 105 (2d Cir. 2020). "Unlawful debt" under 18 U.S.C. § 1961(6) means debt "(A) … which [was] unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate [was] at least twice the enforceable rate." (SPA 39.)

First Premier was repeatedly given loan documents showing in big bold font that the Tucker DBAs were making loans at annual percentage rates of 521% and higher in states where those rates made the loans "unenforceable" "in whole or in part" "because of the laws relating to usury" and were more than "twice the enforceable rate," yet the District Court determined that a jury could not reasonably find First Premier knew the Tucker Lenders "were engaged in a racketeering enterprise," because Moss purportedly could not show "the loans in question violated usury laws." (SPA 22.) The District Court arrived at this surprising conclusion by reasoning that: "[i]t is undisputed that the Tucker Lenders purported

6

to be protected by Native American tribal immunity, and had that been the case, their lending activities would have not been subject to state usury laws." (SPA 22.) As shown in Appellant's Brief, not only was this point "disputed" (and never even raised by either side) it was incorrect as a matter of law. Had the Tucker Lenders actually been "protected by Native American tribal immunity," the Tucker Lenders would only have been protected from state *enforcement* of usury laws. Tribal sovereign immunity would not have made the Tucker Lenders' debts "lawful" and would have provided no immunity to First Premier for joining a racketeering scheme to collect those unlawful debts. (A.B. 43-50.)

First Premier attempts to support the District Court's erroneous reasoning by misstating the relevant authorities on tribal sovereign immunity. (R.B. 54-57.) But those authorities are unambiguous: "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 755 (1998) (citing *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 514 (1991) ("*Potawatomi*") ("States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation … or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores.") (citations omitted)). As it must, this Court follows this binding precedent even with actual tribal loans. *See Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019)

7

("The Tribal Defendants here engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont. But, as the Supreme Court has said, there is a difference between demanding that tribes comply with a law and having the means available to force them to do so." (citing *Kiowa*, 523 U.S. at 755)). Thus, had the Tucker Lenders actually been owned by Native American tribes, their loans would still have been subject to state usury laws, and therefore "unlawful debt" under the plain text of 18 U.S.C. § 1961(6). The states would have simply lacked the power to enforce their civil laws against the tribes. (A.B. 47-49.) "A debt can be 'unlawful' for RICO purposes even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit …." *United States v. Neff*, 787 F. App'x 81, 92 (3d Cir. 2019).

Not only would the loans still have been unlawful, like the wholesalers who supplied unstamped cigarettes to the tribal stores in *Potawatomi* and the "self-declared independent contractor" of the Otoe-Missouria Indian Tribe in *Solomon v. Am. Web Loan*, 375 F. Supp. 3d 638, 662 (E.D. Va. 2019) (A.B. 50), the states could still have enforced their usury laws against First Premier and First Premier would still have been joining in a racketeering scheme to collect unlawful debt. That mistake of law, in and of itself, mandates reversal and remand.[5]

---

[5] That First Premier did not claim it shared the Tribes' sovereign immunity (R.B. 57) only makes it more evident that First Premier knew it was collecting unlawful debt.

In an argument not raised below (indeed, none of the arguments relating to tribal sovereign immunity were raised below), First Premier points to a choice-of-law clause in the promissory notes to claim the loans could have been lawful under the applicable law (without identifying the applicable law or lawful interest rate). (R.B. 55-56.) However, there is no evidence anyone at First Premier reviewed the choice-of-law provisions to determine the legality of the Tucker DBAs' loans (to say nothing of engaging in the complicated choice-of-law analysis that would entail). In any event, this Court has already held choice-of-law provisions in promissory notes for usurious loans unenforceable against consumer borrowers residing in New York. *See United States v. Moseley*, 980 F.3d 9, 22 (2d Cir. 2020) ("In consumer loan contracts, choice-of-law provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy.").

First Premier spends a portion of its brief repeating the description in the operative complaint of the role the Tucker Lenders' false representations of tribal ownership played in defrauding customers and state regulators to bolster the argument First Premier never made to the District Court—that First Premier could not have known the Tucker Lenders "were engaged in a racketeering enterprise," because "the Tucker Lenders purported to be protected by Native American tribal immunity, and had that been the case, their lending activities would have not been subject to state usury laws." (R.B. 49-51.) But this is a red herring. The complaint

never alleges the Tucker Lenders' false claims of tribal ownership were communicated to First Premier, let alone that First Premier relied on them to determine the Tucker DBAs' loans were lawful.[6] And what matters in this Court's appellate review is what evidence was in the record when the District Court ruled on First Premier's summary judgment motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments)).

The only "evidence" of tribal ownership First Premier claims it actually saw was information received as part of its review of Intercept's due diligence of the Tucker Lenders that included a "Non Depository Supervised Loan License" from the Miami Tribe of Oklahoma (JA-849, 863, 804, 803), and a "Certificate of Good Standing" from the Modoc Tribe of Oklahoma (R.B. 52-53), but there is no evidence First Premier relied on these documents for anything and the reviewing employee, Erin Frankman, declared under penalty of perjury that, "I do not have any legal education, training, or experience. I do not have knowledge, expertise, or training

---

[6] Nor do First Premier's own Rule 56.1 statements or myriad declarations make any such contention.

regarding state usury laws and how such laws apply to loans." (JA 1276.)[7]

A reasonable jury would likely reject the conclusion First Premier seeks here—that a certificate from a Native American tribe, reviewed by a person with "no legal education, training or experience," would have led First Premier's most senior executives to believe that the 500% plus interest rate debts they were collecting on behalf of the Tucker DBAs were lawful. What is vastly more probable for a reasonable jury to conclude is that other documents First Premier was provided with, such as that three Tucker DBAs (including One Click Cash) were being investigated by the states of California and Colorado (JA 812; 833; 874), would have caused any layperson to suspect the loans were legally dubious, yet First Premier's most senior executives knowingly ignored that evidence because the Tucker DBAs were generating so much ACH revenue.

Quoting the District Court, First Premier contends the fact that two different state courts were deceived into believing the Tucker Lenders were tribal-owned means that "even if the defendant had investigated the loans based on the red flags

---

[7] First Premier now asserts, "diligence packets that Intercept sent to First Premier included representations that each Tucker Lender was located on tribal lands in Nebraska or Oklahoma" (R.B. 52), but the addresses did not indicate they were on "tribal lands," only that they were in "Miami, OK" (JA 793, 811, 832, 852) and "Niobrara, NE" (JA 873, 882), while their bank accounts were all at the same bank in "Overland Park, KS" (JA 793, 811, 832, 873) and "Kansas City, MO." (JA 852, 882.)

11

highlighted by plaintiff, the defendant would not have uncovered that the loans were illegitimate." (SPA 35; R.B. 51.) Apart from being pure speculation about what First Premier's investigations might have revealed, the two state court decisions to which the District Court and First Premier point make plain that, under *Kiowa* and *Potawatomi*, tribal loans that are usurious under state law *are still unlawful* even if the states lack the power to compel the tribes to comply:

> Although tribes are subject to non-discriminatory state laws for off-reservation conduct ... they are immune from state enforcement actions with respect to those laws, *Potawatomi*, 498 U.S. at 510–11, 111 S.Ct. 905. As the U.S. Supreme Court has explained, "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." *Kiowa*, 523 U.S. at 755, 118 S.Ct. 1700; *see also Potawatomi*, 498 U.S. at 514, 111 S.Ct. 905 (recognizing alternatives to state enforcement actions, including, inter alia, negotiating inter-governmental agreements and seeking appropriate legislation from Congress).

*Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099, 1108 (Colo. 2010).

> Relying on *Kiowa*, *supra*, 523 U.S. 751, 118 S.Ct. 1700, we explained the question was not whether state regulatory laws, here the DDTL, apply to commercial activities conducted outside Indian country by a tribal entity, but whether the tribal entity is protected from a government enforcement action under the doctrine of tribal sovereign immunity. (… *see Kiowa*, at p. 755, 118 S.Ct. 1700 ["[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them"].)

*People v. Miami Nation Enterprises*, 166 Cal. Rptr. 3d 800, 805 (Ct. App. 2014), *review granted, and opinion superseded*, 324 P.3d 834 (Cal. 2014), *and rev'd*, 2 Cal. 5th 222, 386 P.3d 357 (2016).

Tribal sovereign immunity simply prevents state law enforcement against an actual tribal lender, it does not make what is unlawful under state law magically "lawful." *See Neff*, 787 F. App'x at 92 ("Tribal sovereign immunity thus limits how states can enforce their laws against tribes or arms of tribes, but … it does not transfigure debts that are otherwise unlawful under RICO into lawful ones."). The Tucker Lenders' debt would still have been "unlawful" even if they had been real tribal entities, and the District Court overlooked that the states as well as any victim of the unlawful debt collection scheme could have held other non-tribal participants in the RICO conspiracy, like First Premier, fully responsible.

## II. PLAINTIFF MET HER BURDEN OF PRODUCING EVIDENCE OF SPECIFIC FACTS THAT RAISE A GENUINE ISSUE FOR TRIAL AS TO FIRST PREMIER'S KNOWLEDGE OF THE RICO CONSPIRACY.

Stripped of the erroneous conclusion that "the Tucker Lenders purported to be protected by Native American tribal immunity, and had that been the case, their lending activities would have not been subject to state usury laws" (SPA 22), Moss plainly produced evidence such that a reasonable jury could return a verdict in her favor on First Premier's "knowing engagement in the scheme with the intent that the overall goals be effectuated." *United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021). Particularly where, as here, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "even though contrary inferences might reasonably

be drawn." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (citations omitted).

It is undisputed that every single Tucker DBA promissory note First Premier saw showed an interest rate in hundreds of percent in big bold text. And, while the District Court was narrowly correct when it opined on a straw man argument Moss never made that, "[h]igh-interest loans, on their own, do not violate RICO" (SPA 22), collection of high-interest loans are predicate racketeering acts where they meet the definition of 18 U.S.C. § 1961(6). *See United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) ("liability under RICO can be established by proving, inter alia, that the accused 'participate[d], directly or indirectly, in the conduct of [a racketeering] enterprise's affairs through ... collection of unlawful debt.'") (quoting 18 U.S.C. § 1962(c)). At the very least, the District Court's analysis was incomplete when it held that "merely knowing the interest rates on the Tucker Lenders' loans would not be enough to show knowledge of the conspiracy." (SPA 22.) Proof that First Premier *knew* the interest rates on the Tucker Lenders' loans and *also knew* that the loans were being made to borrowers in states where the loans were unenforceable "because of the laws…relating to usury" would show the requisite knowledge. Specifically with regard to New York borrower Moss's loan, "'[i]f usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law.'" *Lateral Recovery LLC v. Funderz.net, LLC*, No. 22-CV-2170

14

(LJL), 2024 WL 4350369, at *35 (S.D.N.Y. Sept. 27, 2024) (quoting *Blue Wolf Cap.*
*Fund II, L.P. v. Am. Stevedoring Inc.*, 961 N.Y.S.2d 86, 89 (1st Dep't 2013)).[8]

On the issue of First Primer's knowledge of the scheme, Moss "[came]
forward with evidence that would be sufficient to support a jury verdict in [her]
favor." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (citation
omitted). Moss showed:

- Kennet approved the Tucker DBAs for ACH services *in writing* despite
  being provided with sample promissory notes showing loans of
  644.12% (JA 719) and 995.45% ((JA 771) to borrowers in New Jersey
  and Pennsylvania, respectively—states where the loans would have
  been unlawful debt under 18 U.S.C. § 1961(6). (JA 720; 772.)

- First Premier's TSRC was reminded *in writing* that "payday lenders
  must abide by state laws and regs." (JA 1445.)

- First Premier's TSRC was informed, *in writing*, that Intercept was
  fielding "State inquiries (ie: [sic] usury laws, licensing, etc.)" regarding

---

[8] First Premier claims Moss is raising an argument "for the first time on appeal that
that there is no scienter requirement for Moss's RICO-conspiracy claim …." (R.B.
45.) Not so, the requisite scienter for RICO conspiracy is "intent that [the
conspiracy's] overall goals be effectuated." *United States v. Zemlyansky*, 908 F.3d 1,
11 (2d Cir. 2018). The point is that, contrary to the District Court's view, evidence
of knowledge of high interest rates is still evidence of "knowing engagement in the
scheme" under 18 U.S.C. § 1962(d) since it would be sufficient to prove scienter on
Moss's loan under 18 U.S.C. § 1962(c). (A.B. 50-51.)

its payday lender clients. (JA 1446.)

- First Premier's Board of Directors was similarly informed, *in writing*, that Intercept was fielding "State inquiries (ie: [sic] usury laws, licensing, etc.)" regarding its payday lender clients. (JA 1465.)

- First Premier's Treasury Services Department (managed by Kennett (JA 533)) reviewed Intercept's underwriting of the Tucker DBAs, which showed two sample loans with "**ANNUAL PERCENTAGE RATES**" of "**644.12%**" and "**995.45%**," respectively, to borrowers in New Jersey. (JA 846; 869.)

- Through the Proof of Authorization ("POA") process, First Premier's Treasury Services Department reviewed no less than 72 real Tucker DBA promissory notes (representing actual loans) which made clear that First Premier was originating ACH debits in repayment of loans to borrowers who lived in Arizona, Arkansas, Connecticut, the District of Columbia Massachusetts Maryland, Montana, New Jersey, *New York*, North Carolina, and Pennsylvania (JA 278-9), all states where the loans were unlawful debt under 18 U.S.C. § 1961(6).

These confirmations of the debt's unlawfulness—which came from different sources at different times in the relationship (including when the ODFI relationship with the Tucker DBAs started) and were consistently clear as to their illegality—

16

belie First Premier's squinty characterization of its engagement in the scheme as merely engaging in "ACH activities" in the "normal course of business." (*See* R.B. 32-34.) And it likewise distinguishes this case from those cited by First Premier in which the evidence showed only that the defendant passively engaged in transactions with conspirators. *See infra* (collecting cases). Why did First Premier's senior officers knowingly stay in the unlawful debt collection scheme? Because the Tucker DBAs ("TFS CORP1," "TFS CORP2," "TFS CORP4," and "*ONECLICK*") were among the top ten ACH originators at First Premier every month (JA 221-37), and because the Tucker DBAs collectively had an ACH debit return rate of 34% (JA 238), generating greater revenue due to the higher fees First Premier received from returns. (JA 221-37.) The Tucker DBA-driven explosive growth in First Premier's ACH volume was so large and lucrative the TSRC rushed to complete a special risk assessment for the Bank's Board of Directors (JA 909) so they wouldn't be forced to close the spigot. And while the TSRC kept referring to "Intercept" and "Intercept's Payday Lender clients" in discussing the gold rush of ACH volume, the underlying data showed that it was specifically the Tucker DBAs driving the explosive "Intercept Payday Lender clients[']'" growth in ACH revenue. (JA 238.)

The importance and centrality of the Tucker DBAs to the profitability of First Premier was made apparent when the Tucker Lenders chose to take their ACH business to another bank in September 2010. A month later, First Premier officers

sought to learn why the "ACH Processing income has been declining[.]" (JA 1572.) Frankman responded: "The decline in ACH income is due to the loss of PayDay Lending items that we are no longer originating." (JA 1571.) In particular, the Tucker Lenders' departure meant "a decline in return items" which were charged "at a higher rate" than ordinary debits, leading to an overall "decline in ACH income." *Id.* Frankman included data from Intercept from August 2010 through November 2010 showing the number of returned items decreased 67% from 370,569 in August 2010 to 122,387 in November 2010. *Id.*

In total, this was evidence sufficient to support a jury verdict in Moss's favor that First Premier knew "the general nature of the conspiracy and that the conspiracy extend[ed] beyond [its] individual role.'" *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir.2000) (quoting *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989)). If the existence of a RICO enterprise is proven (an undisputed fact here), then the court "need inquire only whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of [the] larger enterprise.'" *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021) (quoting *Zichettello*, 208 F.3d at 99, quoting *United States v. Viola*, 35 F3d 37, 44-45 (2d Cir. 1994)).

From the moment Intercept approached First Premier about "originat[ing] ACH debits for loan payments" on behalf of Intercept's client "payday lenders" (JA

18

653), First Premier's TSRC understood what was being asked of it and what Intercept's clients "were up to." *White*, 7 F.4th at 99. When Intercept then brought the Tucker Lenders to First Premier as potential ACH clients, First Premier went even further and agreed to originate ACH debits for loan payments specifically for the Tucker Lender Enterprise based on documents that were so dubious the District Court found that the evidence was sufficient to support a finding that First Premier either knew or should have known that the Tucker Lenders were operating as a single enterprise. (SPA 18-19, 22.)

The combination of documents—provided to First Premier from the outset and then over and over again—showing unambiguously that the Tucker DBAs' loans were usurious; plus the evidence of the importance of those loans to First Premier's bottom line, is enough to support a reasonable jury finding that First Premier was not merely negligent. Based on this cumulative evidence, the jury could find either First Premier knew exactly what was going on, or that the only way First Premier could have continued *not* to know the true facts here was through conscious avoidance. "Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011). And conscious avoidance can be used to "satisfy the knowledge requirement …." (SPA 20 (citing *United States v. Lewis*, 545 F. App'x 9, 11 (2d Cir. 2013) [Summary Order]).) The District Court seemingly agreed: "given

19

the fact-intensiveness of this inquiry, I cannot say it is impossible for a reasonable jury to find that those inconsistencies should have alerted defendant that something was wrong." (SPA 19.) The District Court should have then considered and found the record evidence that First Premier consciously avoided learning of the scheme to allow a jury to ultimately decide that issue.

That distinguishes this case from those cited by First Premier in which the evidence established negligence at most. *See Sheridan v. Jaffe*, No. 94 CIV.9344(AJP)(WK), 1996 WL 345965, at *8 (S.D.N.Y. June 24, 1996) ("At most, Sheridan has presented evidence that Jaffe was a sloppy or negligent financial advisor."); *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 474 (S.D.N.Y. 1996) (same); *Domanus v. Locke Lord LLP*, 847 F.3d 469, 480 (7th Cir. 2017) (evidence insufficient to support finding that lawyer "was avoiding the truth because he did not want to learn the answer"); *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 242 (5th Cir. 2010) ("No one at DSC was actually aware that Frankel was engaged in money laundering; nor was anyone subjectively aware of a high probability that Frankel was engaged in money laundering.").

Unfortunately, the District Court did not then consider whether Moss's evidence was sufficient to support a finding of conscious avoidance, but instead entered the tribal sovereign immunity thicket and never emerged. (SPA 22-25) "Plaintiff simply offers no explanation for how defendant could have learned that

20

the tribal relationships were fraudulent. As a result, no reasonable jury would conclude that defendant possessed sufficient knowledge of the unlawful enterprise." (SPA 25.)

Without the tribal sovereignty error, First Premier's intentional avoidance of confirming (to say nothing of its actual knowledge) that it was originating ACH debits from borrower accounts to repay loans that were usurious under applicable state law cannot seriously be disputed. *See United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011) ("a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge.") (internal quotation marks omitted). Sans the tribal sovereignty enmeshment, surely a reasonable jury could conclude "the circumstances here were sufficiently suspicious that [First Premier's] failure to question or investigate them was indicative of a 'purposeful contrivance to avoid guilty knowledge.'" *United States v. Espino*, No. 21-1412, 2022 WL 4112679, at *4 (2d Cir. Sept. 9, 2022) (Summary Order) (quoting *Kozeny*, 667 F.3d at 134)).

Given the ubiquity of knowledge at the highest levels of First Premier that Intercept was fielding "state inquiries" regarding "usury" because of its (and, by then, First Premier's) payday lender clients, chiefly the Tucker Lenders, First Premier's argument that Moss impermissibly attempted to satisfy the knowledge

21

element through mere "collective knowledge" requires little discussion. Even assuming the holding in First Premier's cited case of *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 690 F. Supp. 256 (S.D.N.Y. 1988), that "a corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual," *id.* at 260, is an accurate statement of the law in this Circuit, Kennett, the manager of First Premier's Treasury Services Department (JA 533) and member of the TSRC (JA 446), was shown everything the rest of the TSRC was shown about Intercept's payday loan clients and also specifically approved the Tucker DBAs as First Premier ACH clients after being given sample loan documents showing the sky-high interest rates and loans to borrowers in New Jersey and Pennsylvania. Kennett was involved in the Intercept Tucker Lender underwriting review (JA 543); and oversaw the Proof of Authorization (POA) process (JA 1617) whereby dozens of real promissory notes showing interest rates of as much as 995.45% on loans made to borrowers in states where those loans would easily meet the test for unlawful debt were reviewed. (JA 241-42.) Kennett herself directly corresponded with Intercept about One Click Cash's Better Business Bureau rating of "F" (JA 900-07) as part of First Premier's review of Intercept's underwriting of SFS, Inc. d/b/a One Click Cash. (JA 543 (Kennett Declaration ¶ 66).) Kennett's knowledge (gleaned within the scope of her direct duties) would

satisfy whatever individual state of mind *First Equity Corp.* would require.[9][10]

Even ignoring Kennett's knowledge, written reports to the TSRC informed every committee member (as if they did not already know) that "payday lenders must abide by state laws and regs" (JA 1445), and that Intercept was fielding "State inquiries (ie: [sic] usury laws, licensing, etc.)" because of its payday lender clients.. (JA 1446.) The information about "State inquiries" regarding "usury laws" was relayed, *in writing* to First Premier's Board of Directors. Not a single person sought to examine the documents in First Premier's own possession to ascertain in what states Intercept's payday lender clients were lending money, or suggested the Bank determine which states were making inquiries regarding "usury laws." Moreover, not a single person at First Premier sought to examine the actual promissory notes, particularly from the Tucker DBAs, that First Premier already had in its possession as a result of the POA Process (JA 240-41) to answer the critical questions of what the interest rates on the Tucker DBAs' loans were, and in what states did their borrowers reside? Like United Parcel Service's shipping of unstamped cigarettes in *New York v. United Parcel Serv., Inc.*, 942 F.3d 554 (2d Cir. 2019), First Premier

---

[9] Kennet was offered as both First Premier's Rule 30(b)(6) designee and an expert witness. (JA 1592-93; 1611.)

[10] Moss does not mean to suggest Kennett was the sole individual who made the actual decision for First Premier to join the Tucker Lender RICO conspiracy. Kennett followed orders.

"failed to utilize information available to it in various places that provided employees, at all levels of its corporate structure, insight into the fact that it was regularly [collecting unlawful debt]." *Id.* at 574. Thus, a reasonable jury could find for Moss on the RICO knowledge element.

### III. PLAINTIFF MET HER BURDEN OF PRODUCING EVIDENCE OF SPECIFIC FACTS THAT RAISE A GENUINE ISSUE FOR TRIAL AS TO FIRST PREMIER'S AGREEMENT TO JOIN THE RICO CONSPIRACY.

As the District Court noted "[t]here is some overlap between the knowledge and agreement elements" (SPA 11) for proof of a RICO conspiracy.[11] Given the District Court's tribal sovereign immunity error on the "knowledge" element, it is not surprising it also found Moss failed to prove the "agreement" element. But divorced of the tribal sovereign immunity imbroglio, proof of the agreement element was sufficiently evidenced notwithstanding that no one at First Premier ever communicated directly with the Tucker Lenders. A RICO conspiracy is "an agreement to conduct or to participate in the conduct of a charged enterprise's affairs

---

[11] "Just as the evidence used to establish the enterprise and pattern elements 'may in particular cases coalesce' ... so too may the evidence used to prove those elements and a conspiratorial agreement to engage in racketeering." *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981) (other citation omitted). *See also*, *JP Morgan Chase Bank, N.A. v. Nowak*, No. 23-CV-6834 (JPO), 2024 WL 1329410, at *6 (S.D.N.Y. Mar. 28, 2024) ("a defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's ... knowledge of wrongdoing.").

through a pattern of racketeering." *Pizzonia*, 577 F.3d at 464. There need not be evidence of a "formal or express agreement … proof the parties had a 'tacit understanding to engage in the offense'" is sufficient. *United States v. Scott*, 979 F.3d 986, 990 (2d Cir. 2020) (quoting *United States v. Amato*, 15 F.3d 230, 235 (2d Cir. 1994).

Regardless of how the facts are parsed here, it is undisputed that the Tucker Lenders authorized Intercept to find an ODFI to collect their usurious loan payments via ACH, and First Premier agreed, *in writing*, to do precisely that. First Premier then went on to collect (or *facilitate* collection of) usurious loan payments on behalf of the Tucker DBAs tens of thousands of times. There was a "meeting of the minds and a manifestation of mutual assent," *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 136 (2d Cir. 2022) (citations omitted), even if there was no direct contact between First Premier and the Tucker Lenders.[12]

First Premier seizes on a minor typographical error to mischaracterize Moss's argument that First Premier's actual commission of the predicate acts of collecting

---

[12] First Premier's angry accusation that Moss's referring to Intercept as Tucker's "middleman" and as "the Tucker DBA's intermediary," as "attempting to portray Intercept as a co-conspirator without ever expressly characterizing Intercept as such" (R.B. 31-32) is unsupported and incorrect. Intercept is nowhere alleged to be a member of the conspiracy. However, regardless of nomenclature, Intercept inarguably was the conduit for both information and money between First Premier and the Tucker Lenders.

unlawful debt evidences agreement under the more rigorous pre-*Salinas* RICO conspiracy standard of proof that "defendant [itself] at least agreed to commit two or more predicate crimes." *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir. 1984), *abrogated by Salinas v. United States*, 522 U.S. 52 (1997). (A.B. 40-41.) While First Premier is correct that, under the ACH Rules "the Originator (here, the lender) is 'the entity that agrees to initiate ACH entries into the payment system,'" (R.B. 38) whether First Premier "initiated" or "originated" the ACH entries, there is little doubt that First Premier was "collecting" unlawful debt within the meaning of 18 U.S.C. § 1962(c). As set forth in Moss's opening brief (A.B. 40), relying on *United States v. Pepe*, 747 F.2d 632, 674 (11th Cir. 1984), the Northern District of Georgia correctly held that an ODFI debiting an account via ACH on behalf of an internet payday lender was "collecting" unlawful debt under RICO:

> In this case, Plaintiff has alleged that Defendant actually collected the unlawful debt not just that it induced Plaintiff to pay. Money changed hands—at least electronically—because Defendant originated the entry on the ACH Network and was willing to provide that access to CashCall. The Court thus concludes that Plaintiff has satisfactorily pleaded that Defendant collected the unlawful debt.

*Parm v. Nat'l Bank of California, N.A.*, No. 4:14-CV-0320-HLM, 2015 WL 11605748, at *25 (N.D. Ga. May 20, 2015), *aff'd*, 835 F.3d 1331 (11th Cir. 2016). First Premier's unsupported argument that only the Tucker Lenders could have "induced" borrowers "to make repayment" (R.B. 39) ignores Congress's choice to use the word "collect" in a statutory scheme intended to combat organized crime at

all levels, including the RICO enterprise's low-level members dispatched to collect unlawful debt.[13]

Contrary to all evidence, First Premier continues to claim that its relationship with the Tucker DBAs was merely "the routine provision of services in the ordinary course." (R.B. p. 41.) However, First Premier never explains why this "routine provision of services" required a special risk management report to the Board of Directors to keep the Tucker DBAs' ACH volume flowing; why a group of supposedly separate clients' supporting documents were so obviously similar "that defendant should have known that the Tucker Lenders were operating together;" or why the Tucker Lenders' departure from First Premier led to such a precipitous drop in ACH revenue that management demanded to know what happened the very next month. There was nothing routine about First Premier's relationship with the Tucker Lenders. It was a RICO conspiracy, and the evidence shows First Premier knowingly agreed to join. The District Court should not have taken that triable issue away from a jury by granting summary judgement to First Premier.

---

[13] While Moss clearly has the better argument that First Premier was actually "collecting" unlawful debt under 18 U.S.C. 1962(c), proof First Premier merely "knew about and agreed to *facilitate* the scheme" would be sufficient here. *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003) (quoting *Salinas*, 522 U.S. at 65) (emphasis added).

## CONCLUSION

For all the foregoing reasons, Appellant respectfully requests that this Court reverse the District Court's August 2, 2024, Order granting summary judgment to First Premier, remanding the case so that Moss can pursue her individual and class claims.

Dated: April 2, 2025

Respectfully submitted,

**KAPLAN GORE LLP**

By: _/s/ Darren T. Kaplan_
Darren T. Kaplan
346 Westbury Ave, Suite 200
Carle Place, NY 11514
Tel: (212) 999-7370
Fax: ((404) 537-3320
dkaplan@kaplangore.com

**KOPELOWITZ OSTROW
FERGUSON WEISELBERG
GILBERT**
Jonathan M. Streisfeld
1 W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Fax: (954) 525-4300
streisfeld@KOlawyers.com

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance with Rule 32(a)**

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(B) because:

    This brief contains 6,750 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365, in 14 pt. font size, Times New Roman.

Dated:  April 2, 2025                    Respectfully submitted,

                         By:   /s/ Darren T. Kaplan
                              Darren T. Kaplan

                              KAPLAN GORE LLP
                              346 Westbury Ave. Suite 200
                              Carle Place, NY 11514
                              Tel: (212) 999-7370
                              Fax: (646) 390-7410
                              dkaplan@kaplangore.com

29